# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**ROBERT L. FOREMAN,**

        **Plaintiff,**

    **v.**                         **Civil Action 2:19-cv-454**
                                            **Chief Judge Algenon L. Marbley**
                                            **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Robert L. Foreman, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

## I.      BACKGROUND

Plaintiff filed his application for DIB and SSI on February 6, 2015, alleging that he was disabled beginning October 12, 2002. (Tr. 322–34). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on October 27, 2017. (Tr. 36–55). At the hearing, Plaintiff amended his alleged onset date to February 3, 2015, and dismissed his claim for DIB. (Tr. 38–39). As such, the ALJ only considered Plaintiff's claim for SSI. (Tr. 16). On April 26, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 16–29). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4).

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity

since October 12, 2002, his alleged onset date. (Tr. 19). He found that Plaintiff suffers from the following severe impairments: disorders of the spine, degenerative joint disease, obesity, anxiety disorder, and mood disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 19).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to occasional push/pull with his lower left extremity. He is able to climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel, crouch, but only occasionally crawl. He should avoid all exposure to dangerous hazards such as unprotected heights. He is limited to simple, routine tasks in a work environment free of fast production rate or pace work. He can have no contact with the public, occasional contact with supervisors, and only occasional and superficial contact with co-workers, with superficial contact defined as no tandem tasks. He is limited to only occasional changes in the work setting and only occasional decision making required.

(Tr. 22).

On February 11, 2019, Plaintiff filed the instant case seeking a review of the Commissioner's decision. (Doc. 1). This matter is now fully briefed and ripe for resolution. (*See* Docs. 9, 10, 11).

**A. Relevant Hearing Testimony**

The ALJ summarized the testimony from Plaintiff's hearing:

> The claimant at the hearing testified that he stopped working in 2002 due to an injury to his knee. He claimed that he received worker's compensation claim for his injury, which was finally paid in 2008. The claimant testified that he is unable to work at the present time due to his back pain, leg pain worse on the left than right, as well as due to his anxiety. He described his pain onset in his back and radiates to his buttocks, legs, and into his toes with associated numbness. He testified that he had been treated with medications including narcotics as well as various injections; however, his medications do not completely resolve his symptoms and the injections treatments were generally ineffective beyond the first week. He denied any side effects from his medications. He noted that he had been discharged by his previous physician due to failure of "pill-count" presumably with narcotic prescriptions. Consequently, he has a new physician treating his back and is currently prescribing narcotics for him. He testified that he had received conflicting recommendations for/against surgery in his back; he has not yet

undergone any surgery but is considering the option in the future. He claimed that due to his pains, he has trouble sleeping and getting up in the morning; he gets about 3 hours of sleep each night. With respect to his anxiety, he testified that he experiences random onsets several times per day usually lasting 45 minutes to an hour. He also alleged to have occasional crying spells; he takes psychotropic medications with some success in relieving his symptoms as well as help with his breathing. He also claimed to have developed non-medication coping skills to manage his anxiety, including focusing on his breathing and pausing to collect himself.

The claimant testified that he is physically limited due to his back pain and he would need help with putting on his shoes and clothes at times. He claimed that he is able to sit and drive for up to 50 or 60 miles before needing to rest for 30 to 45 minutes. He stated that he is unable to walk for more than 50 yards before needing to rest; and he is only able to stand for 10 to 15 minutes at a time. He stated that due to his physical pains, he is unable to play baseball with his son and he had not been able to go fishing/hunting for the last 4 to 5 years. He testified that he does not do chores around the house due to his pains and he does not grocery shop because he is unable to walk far. However, he did testify that he is able to go to his local Eagle's Club (4 miles from his home) on a daily basis, and he is able to drive himself. He claimed that when at the Eagle's Club, he would often eat lunch and converse with others socially.

(Tr. 23).

## B. Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms:

The claimant has had multiple knee surgeries since 2002 to repair his complete tear of anterior cruciate ligament; and he was involved in an automobile accident in 2009, which caused the onset of his back pains (lF/3). His MRI from 2008 noted a disc herniation at L3-L4 eccentric to the right (lF/4). He was also noted with postoperative and degenerative changes in his left knee (2F/62). In May 2009, he was noted to have not yet completed his physical therapy regimen (lF/5). In June 2010, he underwent diagnostic injection to confirm his lumbar spondylosis (lF/8). In July, he underwent injection for his lumbar radiculitis and degenerative disc disease at L5-S l (lF/10). In August, he reportedly did not respond well to the injections and continued to have pain radiating to his left posterior thigh to the foot (lF/12). He also reported experiencing tingling in his left foot at the time and medications were mildly effective. On examination, he had full strength, intact reflexes and sensory; but he had an antalgic gait. He underwent repeat injections to rule out other involved levels at L3-L4 and L4-L5 (lF/13). In November, he was again noted without much relief from those injections (lF/14).

In February 2011, the claimant was ambulating without aids (lF/20). He had limited

3

range of motion at the time in his lower back with flattening of the normal lumbar lordosis, but he did not have any sensory abnormalities. His straight leg raising on the left produced back pain but no clear-cut radicular pain. An EMG was ordered and the result noted no evidence of overt lumbosacral radiculopathy; however, the findings were indicative of early/mild sensory demyelinating peripheral neuropathy (lF/22). His MRI in March 2011 did show minimal impingement that had not significantly changed, but his posterior central disc protrusion at IA- L5 progressed (2F/16; *see also* lF/23). He began treatment with Dr. Michael Sayegh, M.D., in March 2011 (4F/35). At the time, he reported a burning, throbbing, and constant pain in his back ongoing since his auto accident. He was noted to have failed non-steroidal anti-inflammatory drugs, and had been on Percocet and Vicodin. He had used a TENS unit and had underwent chiropractic manipulation therapy, which also reportedly failed. He was in physical therapy three times a week; and his home therapy included exercise, heat, ice, rest, and walking, which all had reportedly failed. On exam, he had decreased sensation in he left lower leg; he had mild positive straight leg raise on the left as well. He had denied any knee pain at the time and there was no edema, inflammation, or congestion noted. In May, the claimant had another onset of back pain and he was advised of conservative treatment options at that time (4F/34).

In September 2011, the claimant's treating physician Dr. Michael Sayegh notified the claimant that he had failed to comply with his prescribed narcotic dosage and consequently, his treatment was terminated by Dr. Sayegh (2F/19). In October 2011, the claimant reestablished treatment with Dr. Sayegh (4F/29). In February 2012, the claimant alleged the same pain levels as before and disturbed sleep (4F/28). On examination, his lower back area showed trigger point and tenderness bilaterally and in the paraspinal muscle. The claimant continued to experience back pain in 2013 and his anxiety disorder was also noted at this time (*e.g.*, 2F/13). Specifically, he had complained of experiencing a panic attack in February 2013 onset with shortness of breath (2F/46). In 2014 and 2015, the claimant continued to show trigger points and tenderness bilaterally and in the paraspinal muscles. Neurological examination of the lower extremities continued to show moderate decreased sensation and decreased tendon reflexes. His straight leg raise test on the left side also continued to be mildly positive. (*e.g.*, 4F/5, 16).

In May 2015, the claimant underwent consultative exam with Dr. Sarah Barwick and he reportedly suffered from anxiety ongoing since beginning of 2015 onset with physical symptoms including heart racing, crying spell, sweaty palms, and shortness of breath (3F/4). In addition, he reported depressive symptoms such as decreased motivation, difficulties with attention and concentration, and difficulty sleeping. He reportedly took sleep medications; his appetite was poor and he experienced low energy and frequent fatigue. He had denied any previous involvement with the mental health system. He indicated interest in beginning psychotropic medication, adding that it had been recommended by his physician. In February 2017, the claimant followed up on his anxiety and depression (5F/6). He had reported gradual worsening of symptoms onset with depressed mood,

difficulty concentrating, insomnia, psychomotor agitation, and unexpected weight loss. He also reported irritability, racing thoughts, and he noted his medications were ineffective. He was put on Buspar and Vistaril as needed (5F/8).

Between August 2015 and July 2017, the claimant continued to have trigger points and tenderness in the back, decreased sensation and reflexes, as well as positive straight leg raises bilaterally first noticed in October 2016 (*see* 6F generally and 6F/9, first mention of bilateral straight leg raise). In October 2017, the claimant's lumbar x-rays noted osteopenia without acute osseous abnormalities (8F). There were also only mild multi-level degenerative disc disease and facet disease in the lumbar. Of note, the claimant was no longer seeing Dr. Sayegh in October 2017; he had sought treatment and medication from Dr. Schowengerdt who ordered a toxicology screening in order to assess whether narcotic pain medication can be prescribed (9F/16).

The claimant's obesity is also noted at various times (*e.g.*, 9F). His body mass index was noted at 30.82 in January 2018 (l0F/3). Since the evidence indicates the claimant was obese for at least part of the period in question, the undersigned carefully considered Social Security Ruling 02-1p, which discusses obesity and its potential for causing or contributing to other impairments. However, the evidence indicates few, if any, significant findings related to the claimant's obesity. Therefore, the exertional, postural, and environmental limitations described in the residual functional capacity above include consideration of the claimant's obesity.

(Tr. 24–25).

## The ALJ's Decision

After thoroughly reviewing the hearing testimony and medical record, the ALJ concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were "somewhat inconsistent with the record." (Tr. 25). The ALJ elaborated on this conclusion:

The claimant testified that he experiences random onsets of anxiety several times per day usually lasting 45 minutes to an hour. However, his examinations generally noted normal mood and affects and there was little to no evidence of treatment other than initially in May 2015 and subsequently in February 2017 (3F/4; 5F). He testified that his medications are somewhat effective in relieving his symptoms as well as help with his breathing. The claimant was noted to have developed coping mechanisms including controlling his breathing for mood stability. The claimant testified that he is physically limited due to his back pain and he would need help with putting on his shoes and cloth [sic] at times. However, the claimant's examinations, as detailed above, were fairly normal and any abnormalities were fairly mild. . . .

(*Id.*).

The ALJ then turned to the opinion evidence. First, he considered the opinions of state agency consultants, Dr. Venkatachala Sreenivas and Dr. Leon Hughes, who opined in 2015 that Plaintiff could perform light exertional work but with certain postural limitations. (Tr. 26). The ALJ afforded these opinions "significant weight," explaining that "they are generally consistent with the record[.]" (*Id.*). He noted that, although the consultants did not treat or examine Plaintiff, "they provided specific reasons for their opinions about [his] residual functional capacity showing that they were grounded in evidence in the case record, including careful consideration of the treating and examining doctor's opinion as well as the claimant's allegations about his symptoms and limitations." (*Id.*).

Next, the ALJ considered the opinions of state consultants, Dr. Cindy Matyi and Dr. Jame Lai, who opined as to Plaintiff's mental health limitations in the workplace. (*Id.*). The ALJ assigned their opinions "some weight," explaining that they cited "the old version of the B criteria," were "vague," and were "not in specific vocational terms." (*Id.*).

The ALJ then turned to the opinions of Plaintiff's treating physician Dr. Michael Sayegh. In February 2015, Dr. Sayegh opined in a medical source statement that Plaintiff had limited ability to sit, stand, and walk due to pain and should avoid bending, stooping, lifting, and carrying. (Tr. 574). He also opined that Plaintiff's concentration and ability to think clearly could be impacted by his pain and medications. (*Id.*). In August 2017, Dr. Sayegh partially completed another medical source statement. (Tr. 651–54). He noted that, as of July 27, 2017, Plaintiff was no longer his patient. (Tr. 651). He listed Plaintiff's diagnoses and opined that they were expected to last at least twelve months. (*Id.*). However, he did not complete the remaining three pages of the form and did not opine on Plaintiff's functional limitations. (*See* Tr. 652–54).

The ALJ afforded Dr. Sayegh's opinions "little weight." He explained:

> Generally, more weight is afforded to the opinion of a treating source as the treating source is most often in the best position to provide a detailed, longitudinal picture of the claimant's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings or one time examinations (20 CFR 416.927). If a treating source's medical opinion is well-supported and consistent with the other substantial evidence in the case record, it must be given controlling weight (20 CFR 416.927, SSR 96-2p). When a treating source opinion is not afforded controlling weight, the following factors will be considered: the length of the treatment relationship and the frequency of treatment, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion, any relevant specialty of the treating source, and other relevant factors (20 CFR 416.927). Although Dr. Sayegh is a treating medical source and he has treated the claimant for an extensive period; but his opinion is not clearly explained nor is it specific with respect to what degree of functional limitation is expected. Simply limiting the claimant to pain tolerance is not precise nor can it translate objectively for the purpose of this decision. Moreover, his opinions are extreme and not consistent with the record, as detailed above, which shows the claimant was fairly normal on examination.

(Tr. 26–27).

Finally, the ALJ considered the opinion of consultative examiner, Dr. Sarah Barwick, who opined in May 2015 that Plaintiff lacked the capacity to respond appropriately to work pressure in a work setting. (Tr. 27). The ALJ assigned this opinion "some" weight "to the extent that it is consistent with the record," but explained that it "is not well explained and lacks specificity." (*Id.*).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

In his sole assignment of error, Plaintiff asserts that the ALJ failed to provide good reasons for not assigning controlling weight to the opinions of his treating physician, Dr. Sayegh. (*See generally* Doc. 9).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must

be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

> *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and

quotation marks omitted). The treating physician rule and the good reasons rule together create

what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r*

*of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here the ALJ satisfied both steps. First, he recognized that, under the treating physician

rule, treating physicians' opinions are generally afforded deference. He explained:

> Generally, more weight is afforded to the opinion of a treating source as the treating source is most often in the best position to provide a detailed, longitudinal picture of the claimant's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings or one time examinations. (20 CFR 416.927). If a treating source's medical opinion is well-supported and consistent with the other substantial evidence in the case record, it must be given controlling weight. (20 CFR 417.927, SSR 96-2p). When a treating source opinion is not afforded controlling weight, the following factors will be considered: the length of the treatment relationship and the frequency of treatment, the nature and extent of the of the treatment relationship, the supportability of the opinion, the consistency of the opinion, any relevant specialty of the treating source, and other relevant factors (20 CFR 416.927).

(Tr. 26–27).

With that framework in mind, the ALJ articulated good reasons, under the second step of

the analysis, for assigning Dr. Sayegh's opinions "little weight." First, he found that Dr. Sayegh's

opinions were too vague. (Tr. 27). He explained:

> Although Dr. Sayegh is a treating medical source and he has treated the claimant

for an extensive period; [ ] his opinion is not clearly explained nor is it specific with respect to what degree of functional limitation is expected. Simply limiting the claimant to pain tolerance is not precise nor can it translate objectively for the purpose of this decision.

(*Id*.).

Plaintiff resists this explanation, maintaining that "[w]hile Dr. Sayegh may not have provided a traditional function-by-function analysis," he "identifies specific functional limitations," including that Plaintiff cannot bend, stoop, lift, or crawl. (Doc. 9 at 7). But in reviewing Dr. Sayegh's opinions, the Court finds that the ALJ reasonably concluded that they were unclear and overly vague.

In his first opinion, from February 25, 2015, Dr Sayegh opined that Plaintiff had the following limitations: "limited ability to sit/stand, walk [due to] pain; No bending, stooping, lifting, crawling; concentration and ability to think clearly may be affected by pain + meds (opioid therapy)." (Tr. 574). The rest of Dr. Sayegh's medical source statement is similarly threadbare. He listed his diagnoses and noted that he suffered from back pain for years due to an auto accident. (Tr. 573). Under the section asking for a description of "all pertinent findings on clinical examination (with dates) related to the patient's condition," Dr. Sayegh provided only, "lumbar paraspinal muscle tenderness/trigger pts., neuro sensation mod, tendon reflexes left leg, left leg raising test mildly positive." (*Id*.). Similarly, under the section asking for "available consultative/diagnostic testing . . . on file regarding the patient's condition," Dr. Sayegh wrote simply "MRI—L 3/22/12." As for "treatments/future treatments," he provided, "possible LESI, facet inj., rhizotomy, PT, CT, tens unit, back brace." (*Id*.). He also listed his medications and corresponding dosages. (Tr. 574). Finally, when asked for a written description of "the prescribed therapy and the patient's response to therapy," Dr. Sayegh wrote only "see above, helping pain and sciatica." (*Id*.).

Dr. Sayegh's second opinion is even less substantial. On August 28, 2017, Dr. Sayegh completed just part of a functional capacity checklist. (Tr. 651–54). Importantly, he noted that he no longer treated Plaintiff and that his last appointment with him was on July 27, 2017. (Tr. 651). He listed his diagnoses and noted that his prognosis was "fair." (*Id*.). However, Dr. Sayegh left the rest of the checklist blank and consequently, did not provide any opinions regarding his functional limitations. (*See* Tr. 652–54).

Given the conclusory and vague nature of Dr. Sayegh's opinions, substantial evidence supports the ALJ's decision discounting them. Indeed, another district court recently upheld an ALJ's decision for similar reasons. *See Phillips v. Berryhill*, No. 3:16-CV-193-CHL, 2017 WL 6045451, at *4 (W.D. Ky. Dec. 6, 2017). In *Phillips*, the court upheld the ALJ's decision rejecting the treating physician's opinion on the basis that it was vague, unexplained, and exaggerated. *See id*. Upon review of the treating physician's opinion, the court noted that, on a section of the form asking for an explanation of the basis for any functional limitations, the treating physician wrote only "'MRI' and "back surgery.'" *Id*. (citation omitted). The court found this explanation "both unclear and unhelpful in judging the rationale behind the limitations [the treating physician] placed on Plaintiff." *Id*. Moreover, the treating physician "did not attach any MRI results to her opinion or explain how specifically the 'MRI' and 'back surgery' supported her suggested limitations." *Id*. And, like the treating physician in this case, the treating physician in *Phillips* left an important explanatory section of the form blank. *Id*.

Ultimately, the court concluded that, "[b]ecause of the conclusory and explanation-free nature of [the treating physician's] limitations and the lack of supporting, objective findings, substantial evidence support[ted] the ALJ's decision to deny her opinion controlling weight." *Id*. (citing F.R. § 404.1527(c)(3) (stating that the more a medical source presents relevant evidence

and explains the basis behind her medical opinion, the more weight the ALJ will afford to it)).

The same is true here. The ALJ applied the proper standard to Dr. Sayegh's opinions; however, he was not required to afford them controlling weight because they were unclear and unhelpful in ascertaining Plaintiff's functional limitations. *See id*. As the court noted in *Phillips*, "[t]he lack of objective medical evidence to support the [treating source] opinion qualifies as a 'good reason' as used in 20 C.F.R. § 404.1527(c)." Consequently, Plaintiff has failed to show reversible error. *See also Acosta v. Comm'r of Soc. Sec.*, No. 17-12414, 2018 WL 7254256, at *9–10 (E.D. Mich. Sept. 6, 2018), *report and recommendation adopted*, No. 17-12414, 2019 WL 275931 (E.D. Mich. Jan. 22, 2019) (holding that treating physician's opinions were vague and could not be "translate[d] into functional limitations that [could] be properly incorporated into an RFC," because, for example, the opinion does "not explain how plaintiff was limited or whether she could only do certain activities for a certain amount of time in each day"); *Hanna v. Colvin*, No. 5:13CV1360, 2014 WL 3749420, at *15 (N.D. Ohio July 30, 2014) (upholding ALJ's decision rejecting treating physician's opinion on the grounds that it was incomplete and internally inconsistent, and noting that "courts have upheld an ALJ's rejection of a physician opinion on the grounds that it is inconsistent, unclear, or vague"); *Bennett v. Comm'r of Soc. Sec.*, No. 1:07-CV-1005, 2011 WL 1230526, at *4 (W.D. Mich. Mar. 31, 2011) (upholding ALJ's decision discounting physician's vague opinion) (citing *Tempesta v. Astrue*, No. CV-08-00003 (FB), 2009 WL 211362, at *7 (E.D.N.Y. Jan. 28, 2009) (characterizing treating physician's opinion as "vague," and therefore of little value to the ALJ)).

Briefly, the ALJ also found that Dr. Sayegh's opinions were "extreme and not consistent with the record, as detailed above, which shows the claimant was fairly normal on examination." (Tr. 27). Plaintiff asserts that the ALJ "failed to cite any specific treatment note or other part of

the medical record to support" this conclusion. (Doc. 9 at 8). However, upon review of his decision, it is clear that the ALJ simply referred back to his earlier discussion of the records. (Tr. 27). Indeed, his opinion details various inconsistencies as well as benign or mild exam findings. (*See, e.g.*, Tr. 24 (discussing 2009 exam records showing full strength, intact reflexes and sensory but antalgic gait); *id*. (discussing 2011 EMG records showing no evidence of overt lumbosacral radiculopathy, but showing findings indicative of early/mild sensory demyelinating peripheral neuropathy); *id*. (discussing March 2011 MRI results showing minimal impingement that had not significantly changed, but showing that his posterior central disc protrusion at L4-L5 had progressed); *id*. (discussing treatment with Dr. Sayegh, including exam records showing decreased sensation in the left lower leg and mild positive straight leg raise on the left leg); *id*. (discussing Dr. Sayegh's treatment records, including exam records revealing lower back trigger points and tenderness bilaterally, as well as anxiety and panic attacks); Tr. 24–25 (discussing exam records showing moderate decreased sensation and decreased tendon reflexes, as well as mildly positive straight leg raise tests on the left side); Tr. 25 (discussing October 2017 lumbar x-rays revealing osteopenia without acute osseous abnormalities, mild multi-level degenerative disc disease and facet disease in the lumbar)).

After considering these records, the ALJ concluded that the intensity of Plaintiff's symptoms as alleged were not supported by the record. He explained that Plaintiff's examinations, "as detailed above," were "fairly normal," and that any "abnormalities were fairly mild." (*Id*.). Accordingly, Plaintiff's argument that the ALJ failed to cite any treatment notes in support of his conclusion is unpersuasive.

At base, although Plaintiff may disagree with the ALJ's conclusion, the ALJ's decision to reject Dr. Sayegh's opinion was appropriate because he found it vague, lacking specificity,

extreme, and inconsistent with the record. Further, the ALJ's explanation provided sufficient detail to satisfy the good-reasons requirement. *See, e.g.*, *Acosta*, 2018 WL 7254256, at *9–10 (finding that the treating physicians' opinions were "too vague to provide any insight to plaintiff's specific functional abilities"); *Phillips*, 2017 WL 6045451, at *4 (upholding ALJ's decision discounting treating physician's opinion on the basis that it was "unclear and unhelpful in judging the rationale behind the limitations she placed on plaintiff"); *Hanna* (upholding ALJ's decision discounting treating physician's opinion where opinion was inconsistent with the medical evidence and incomplete and internally inconsistent). The ALJ therefore did not err in declining to assign Dr. Sayegh's opinions controlling weight.

## IV.     CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.     PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   October 18, 2019                           /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE